# IN THE COURT OF APPEALS OF IOWA

No. 17-0556
Filed June 21, 2017

**IN THE INTEREST OF J.R., S.C., and J.R.,**
**Minor Children,**

**K.R., Mother,**
　　　　Appellant.
_____

Appeal from the Iowa District Court for Polk County, Susan Choate Cox, District Associate Judge.

A mother appeals the termination of her parental rights to her three children. **AFFIRMED.**

Jami J. Hagemeier of Williams & Hagemeier, P.L.C., Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Ana Dixit, Assistant Attorney General, for appellee State.

John P. Jellineck of Public Defender Office, Des Moines, guardian ad litem for minor children.

Considered by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

This termination-of-parental-rights appeal illustrates the intractable and destructive nature of domestic violence. A mother, Kyra, appeals from a juvenile court order terminating her parental rights to her three children—five-year-old J.C.R., three-year-old S.C., and one-year-old J.L.R. Kyra argues the State failed to prove the statutory grounds for termination by clear and convincing evidence and termination was not in the children's best interests. Specifically, she contends the juvenile court should not have based its termination decision solely on her inability to protect the children from exposure to domestic abuse perpetrated against her by the children's father, Shane. Kyra asserts she tried to cut off contact with Shane, but her safety plans "did not work."[1] In addition, Kyra maintains the court should not have terminated her parental rights due to the close bond the children share with her. She alternatively asks for additional time to work toward reunification.

No doubt exists that Kyra was the victim of repeated acts of domestic violence committed by Shane. The mother's attorney makes compelling arguments in the petition on appeal, alleging "re-victimization" faced by Kyra in these child-welfare proceedings. But after reviewing the entire record and giving appropriate deference to the juvenile court's credibility determinations, we find clear and convincing evidence to support the thorough findings of the juvenile

---

[1] Throughout her petition on appeal, Kyra also contends "[a] more realistic safety plan[] should have been created." Our record does not indicate Kyra raised this concern to the juvenile court before the termination hearing. To the extent Kyra's complaint is an argument the State did not provide reasonable efforts at reunification, we find her argument is not preserved for our review. *See In re T.S.*, 868 N.W.2d 425, 442 (Iowa Ct. App. 2015) ("[W]e will not review a reasonable efforts claim unless it is raised prior to the termination hearing.").

court and its ultimate conclusion that "the mother cannot and/or will not protect the children from their 'dangerous' father."[2]

##  I.      Background Facts and Prior Proceedings

Shane has engaged in a pattern of domestic abuse against Kyra, often in the presence of their oldest child, J.C.R.  The Iowa Department of Human Services (DHS) first became involved with the family in December 2012, when J.C.R. was one year old, after Kyra reported to the police that Shane had strangled her during an argument.  The State charged Shane with child endangerment and domestic-abuse assault but later dismissed both counts, indicating "victim's statements post-arrest has made her unavailable for trial."

In the next three and a half years, the domestic violence continued, and the DHS repeatedly expressed concerns to Kyra about her relationship with Shane.  The juvenile court first ordered the removal of J.C.R. and S.C., who was born in January 2014, from Kyra's care in March 2014 as a result of those concerns.  The court adjudicated J.C.R. and S.C. as children in need of assistance (CINA), ordered no contact between Kyra and Shane, and returned the children to Kyra's care three days after removal.

The children's return home was short-lived.  The following month the court again ordered their removal after the State presented recordings of phone calls between Kyra and Shane while he was in jail.  Between 2014 and 2016, the

---

[2] Our review is de novo.  *See In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016).  We are not bound by the fact findings of the juvenile court, but we do give them weight, particularly regarding the credibility of witnesses.  *See id.*  "We will uphold an order terminating parental rights if there is clear and convincing evidence of grounds for termination under Iowa Code section 232.116."  *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).  We find evidence to be "clear and convincing" when there are no "serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence."  *See M.W.*, 876 N.W.2d at 219 (alteration in original) (citation omitted).

children moved in and out of Kyra's home on three separate occasions. Kyra participated in therapy and domestic-violence-awareness classes and consistently denied having contact with Shane. Yet observations of DHS case workers, police reports, and, occasionally, Kyra's own admissions all indicated the parents continued to spend time together.

The juvenile court terminated Shane's parental rights on July 31, 2015.[3] That same evening, a social worker saw Kyra and Shane at a Chuck E. Cheese restaurant with the children. About a week later, on August 7, J.C.R. and S.C. were removed from Kyra's care after a social worker made an unannounced visit at Kyra's apartment and found Shane in her bed. J.C.R. and S.C. have not been returned to Kyra's care since that removal. Kyra became pregnant with J.L.R. shortly thereafter.

J.L.R. was born in June 2016. In violation of Kyra's safety plans, Shane visited Kyra in the hospital. He caused a disturbance and was escorted out by hospital security. J.L.R. was removed from Kyra's care two days later. Kyra

---

[3] The court terminated Shane's parental rights under Iowa Code section 232.116(1)(b) and (h) (2015). Throughout the proceedings, Shane struggled with mental-health and substance-abuse issues. His diagnoses included "psychosis, paranoia, depression, [and] anxiety." In the termination order, the court noted: "[Shane's] substance abuse issues are not resolved as he regularly tested positive for illegal drugs during the [CINA] proceedings. [Shane] never addressed his mental health issues as he never engaged in any mental health-related services and he continued his erratic behavior through the entirety of the [CINA] proceedings."
  The court continued: "Probably most important to this [c]ourt, the father's issues of domestic violence and the toxic relationship that he has with the child's mother is not resolved or even addressed." Particularly concerning was J.C.R.'s role in the violent incidents between Shane and Kyra. On more than one occasion, J.C.R. witnessed Shane abusing Kyra. And in other instances, J.C.R. was thrust in the midst of the dispute. In the incident that first prompted DHS involvement, Shane grabbed then one-year-old J.C.R. and fled through the streets on foot despite the bitterly cold December weather. Kyra told police Shane threatened that she would "never see the child again."

testified at J.L.R.'s removal hearing that she did not give Shane the hospital room number, yet the nursing staff reported he walked directly to Kyra's room.

The State filed a petition to terminate Kyra's parental rights to J.C.R. and S.C. on June 10, 2016, and to J.L.R. on November 1, 2016. But still, Kyra continued to have contact with Shane. On September 27, 2016, case workers visited Kyra's apartment unannounced and found Shane hiding under her bed. On October 4, Kyra called the police to report Shane stole her wallet after he helped her put a new battery in her truck. In mid-November, a case worker saw Shane pulling out of Kyra's driveway in her truck. And on November 25, Shane crashed Kyra's truck while fleeing from the police, and police found ammunition, Shane's personal documents, and marijuana inside.

At the termination hearing on January 26, 2017, Kyra took the stand to explain these incidents. Regarding the September 27 encounter, Kyra testified Shane was at her apartment returning her phone that had been stolen a few days earlier. She told the court Shane had been using her bathroom and hid under the bed when the doorbell rang. In explanation for the October 4 contact, Kyra testified she lied to the police about the incident. According to Kyra's testimony, she had been walking to her truck with her sister when Shane approached and told her he wanted the battery back he had previously put in her car. According to Kyra, he then took her wallet. Kyra also testified Shane had her truck on November 25 because he had stolen it. She told the court she reported the vehicle as stolen, but she did not have documentation of her report to the police. Kyra summarized her position: "No matter how hard I try to follow my safety plan

to keep myself safe and fight to get my children back, Shane always seems to find a way to violate me not because we're having contact. He always finds a way to violate me." Shane also testified at the termination hearing, generally corroborating Kyra's version of events.

On March 26, 2017, the juvenile court issued a detailed, forty-six-page order terminating Kyra's parental rights to her three children under Iowa Code section 232.116(1)(f) and (h) (2016).[4] The court specifically rejected Kyra's explanations for her recent contact with Shane:

> First, the mother's version of events do not make sense. The most recent outlandish explanations are similar to the explanations she has previously provided—later admitting they were false.
> Second, the mother's demeanor in testifying is unfortunately similar to other times she provided the [c]ourt with false information. When testifying falsely, the mother stares and rarely blinks.

The court found Shane's testimony to be similarly incredible.

Kyra appeals the juvenile court's termination order.

**II.    Analysis**

**A.    Statutory Grounds**

Iowa Code section 232.116(1)(f) and (h) both require a finding by clear and convincing evidence the children cannot be returned to their mother's custody at the time of the termination hearing. *See* Iowa Code § 232.116(1)(f)(4), (h)(4). On appeal, Kyra challenges the sufficiency of the State's proof of this element only. Kyra contends the juvenile court erred in its credibility determinations and the State did not prove she maintained an ongoing

---

[4] The juvenile court also terminated Shane's parental rights to J.L.R. Shane is not a party to this appeal.

relationship with Shane. In the alternative, Kyra asserts: "Even if the appellate court finds [Kyra] to be engaged in a voluntary relationship with [Shane], domestic violence alone should not be a reason to terminate parental rights."

The threat to children posed by domestic violence in their home may serve as the basis for terminating parental rights. *See In re C.C.*, 538 N.W.2d 664, 667 (Iowa Ct. App. 1995) (upholding termination where mother's continuation of an abusive relationship potentially exposed the children to danger). Our case law has recognized: "Children raised in homes touched by domestic abuse are often left with deep scars, revealed in the form of increased anxiety, insecurity, and a greater likelihood for later problems in interpersonal relationships." *See In re Marriage of Brainard*, 523 N.W.2d 611, 615 (Iowa Ct. App. 1994) (embracing expert testimony). In addition, "domestic abuse places children at a greater risk of being physically abused." *Id.*

In this case, we reach the same conclusion as the juvenile court: Kyra's three young children could not be safely returned to her care at the time of the termination hearing because the evidence established that Kyra continued to maintain a relationship with her abuser throughout the proceedings. Given the juvenile court's opportunity to observe Kyra and Shane over the nearly three-year course of the CINA proceedings, we defer to the credibility findings of the juvenile court. *See In re Marriage of Gensley*, 777 N.W.2d 705, 717 (Iowa Ct. App. 2009) (noting trial court's ability to sense the parties' "level of hostility that appeared to hinder decision making in regard to [their] children"). Moreover, we agree Kyra's explanations for her repeated contact with Shane were unbelievable.

Quoting *In re J.T.*, Kyra contends: "Past performance is not an absolute predictor of the future; it only may be indicative of what the future holds." No. 15-1338, 2015 WL 5969450, at *4 (Iowa Ct. App. Oct. 14, 2015) (finding evidence insufficient to support termination when mother testified she ended relationship with father and only evidence suggesting otherwise was the fact "the mother gave the father three rides to family events" and a report from an unidentified individual that the father had resumed living with the mother). But we are not faced with the same minimal evidence here. We rely not only upon Kyra's repeated contacts with Shane in the several years the CINA case was pending but also those interactions in the time leading up to the termination hearing. Just four months before the termination hearing, DHS workers found Shane hiding in Kyra's bedroom. And in the ensuing months, the two parents continued to have contact with one another.

Although Kyra voiced the importance of protecting her children from Shane, her actions and deception throughout the course of the proceedings do not reflect a true appreciation of the danger he poses or a genuine commitment to providing a safe home for her children. *See In re S.O.*, 483 N.W.2d 602, 603 (Iowa 1992) (finding return to mother's care would place children "in imminent risk of harm" due to her "pattern of sporadic cohabitation and visitation" with abusive father and her "failure to protect the children from abuse"); *In re T.S.*, 868 N.W.2d at 435 (finding statutory grounds for termination satisfied when mother "had attended domestic violence classes; however, she continued to see her abuser . . . on multiple occasions and in violation of the no-contact order"). Further, we reject Kyra's contention that her inability to shield her children from

domestic abuse should not be a reason to terminate her parental rights—the safety and well-being of Kyra's children are paramount in our decision. *See T.S.*, 868 N.W.2d at 435; *see also* Iowa Code § 232.116(2). Accordingly, because the risk remains that J.C.R., S.C., and J.L.R. would confront harm in their mother's care, we find the State satisfied the statutory grounds for termination.

### B. Best Interests of the Children

After finding the State proved the statutory requirements for termination, we next consider whether termination of Kyra's parental rights was in the children's best interests, giving principal consideration to the safety of the children, to the best placement for fostering their "long-term nurturing and growth," and to the children's "physical, mental, and emotional condition and needs." *See* Iowa Code § 232.116(2).

Kyra argues termination is not in the children's best interests because of the bond she shares with them. But even a robust parent-child bond will not satisfy the best-interests requirement if a return to the parent's custody risks further harm to the child. *See In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010) (directing court to apply "the best-interest framework established in section 232.116(2)"); *S.O.*, 483 N.W.2d at 604 (terminating despite "strong bond" between mother and children when mother failed to protect children from abusive father). Throughout the proceedings, Kyra failed to allay the juvenile court's primary concern: her ongoing relationship with Shane. Although, in therapy, Kyra expressed an understanding of the danger Shane poses to her and the children, as of yet, she has been either unable or unwilling to cut off contact with him. Kyra's submission to continuing contact with Shane is particularly concerning

because past domestic violence occurred in front of J.C.R., including one incident in which Shane argued with Kyra while holding J.C.R. in one hand and an eight-inch butcher knife in the other. Considering the children's safety and long-term emotional needs, we find termination is in their best interests.

### C. Permissive Factors and Additional Time

Finally, Kyra argues the juvenile court should have declined to terminate her parental rights under Iowa Code section 232.116(3)(c) or, alternatively, granted her an additional six months to achieve reunification under Iowa Code section 232.104(2)(b).

Under Iowa Code section 232.116(3)(c), the court may decline to terminate parental rights if the court finds it "would be detrimental to the child at the time due to the closeness of the parent-child relationship." The court has discretion "based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in [section 232.116(3)] to save the parent-child relationship." *In re D.S.*, 806 N.W.2d 458, 475 (Iowa Ct. App. 2011). For the reasons discussed above, we decline to find the closeness of the relationship between Kyra and her children should prevent termination here.

Nor do we find a six-month extension to be appropriate. To grant a parent more time to achieve reunification, the court must "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no long exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). Considering Kyra's repeated dishonesty with the DHS workers and the juvenile court, her continued contact with Shane, and the length of time

already afforded for reunification, we cannot conclude the need for the children's removal will be resolved in another six months.

Accordingly, we affirm the juvenile court order terminating Kyra's parental rights.

**AFFIRMED.**